UNITED STATES of America

v.

Charles PRAETORIUS, Diann Praetorius, et al., Defendants.

No. 78 CR 135(S)(2).

United States District Court,
E. D. New York.

Sept. 15, 1978.

Edward R. Korman, U. S. Atty., Brooklyn, N. Y. (Richard L. Huffman, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for plaintiff.

Howard J. Diller, New York City, for defendant Charles Praetorius.

Martin L. Schmukler, New York City, for defendant Diann Praetorius.

## AMENDED MEMORANDUM AND ORDER

NICKERSON, District Judge.

Charles and Diann Praetorius, indicted along with numerous others for violations of the laws relating to drugs, 21 U.S.C. §§ 841 ff., have moved to suppress evidence seized by government officers in their house in Pleasantville, New York. The indictment charges, among other things, a widespread conspiracy to import heroin from Bangkok, Thailand, and includes several counts alleging actual importation. The court finds the following facts.

On March 15, 1978, subsequent to the indictment, federal, state and local officers met to receive instructions for the arrest of the various defendants. Drug Enforcement Administration ("DEA") agent Michael Yanniello, the so-called case agent, conducted the meeting. The officers were to divide into teams, and Yanniello explained the nature of the case, the contents of the arrest packages, and the locations where the defendants might be found. He also instructed the officers that "if they were in a position to obtain the passports of the defendants upon their arrest to do so" and to tell the defendants that "most likely the surrender of that passport would be a condition of bail" (Tr. 365).* The passports would be relevant evidence since any stamps contained in them would show whether the defendants had visited Thailand and, if so, on what dates.

On March 16, 1978, the teams deployed to various areas where it was anticipated the defendants would be found. Some time around 3:30 or 3:45 in the afternoon of March 16, 1978 Detective Sergeant James Thompson of the Suffolk County Police Department met DEA agent Robert O'Leary at LaGuardia airport. They, together with other officers, then proceeded to the Praetorius residence, arriving shortly before 6:00 P.M. Several members of the Pleasantville police department, including its

---

* References in parentheses are to the transcript and the exhibits.

chief, were waiting for them around the corner.

The officers knocked on the door but received no immediate answer. Soon, however, Ms. Praetorius, who looked out the window, recognized the Pleasantville Chief of Police and, garbed in her bathrobe, opened the door. The officers displayed their shields. O'Leary had his gun drawn and held it at his side. Ms. Praetorius invited the officers in. O'Leary showed her an arrest warrant, advised her that she was under arrest, and read to her from a card (Ex. 1A) the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He also recited the final two sentences printed on the card reading "Do you understand your rights? Do you elect to waive them?"

Ms. Praetorius, who was nervous, did not respond but simply looked totally astonished. (On this point the court accepts the testimony of Thompson, whom the court finds thoroughly credible, rather than the testimony of O'Leary). The officers then told her that "one of the conditions of her bail, at arraignment, would be the surrender of both her passport and that of her husband, Charles Praetorius" (Tr. 192).

With that Ms. Praetorius said the passports were probably upstairs in the bedroom. The officers accompanied her to the bedroom. Thompson then showed her a blank DEA consent to search form (Ex. 217), to authorize a search. The form recited, in substance, that the signatory might require a search warrant prior to any search, might refuse to consent to a search, and might consult with anyone of his choosing before consenting, and that anything subject to seizure found as a result of the search could be used in a criminal prosecution. Thompson told her that she had been arrested for conspiracy to distribute narcotics, that he would like to search the house to see if any drugs or proceeds of drugs were concealed on the premises, and that, since the officers had no search warrant, they could search only with her consent. Ms. Praetorius after reading the form responded: "I have nothing to hide here.

You can look anywhere you wish. I will just not sign anything until I have spoken to my husband" (Tr. 263).

After Thompson asked again where the passports might be, Ms. Praetorius picked up from a table her pocket book and began looking in it. At Thompson's request she handed it to O'Leary, who found in it approximately $3,300 in cash which he seized after asking what the money was for. She said it was her household money.

The officers then asked once more the location of the passports, and she said they might possibly be in the men's wardrobe which contained her husband's suits. She started to look in one of the suits but was "very nervous and upset at the time" (Tr. 193) and therefore asked O'Leary if he would look through the suits. He patted down the suits and in one suit found and seized approximately $6,000 and some heroin.

Thompson then asked her to get dressed, to pick out the clothing she wished to wear, and to submit it to him for inspection. She did so and dressed in the bathroom.

When she emerged the officers again asked her where the passports might be. She replied that she and her husband were planning a trip and that the papers needed for the trip would be located in a briefcase on a table near the bed. She, Thompson and O'Leary went over to the table where she pointed to a brown briefcase. O'Leary opened it and found no passports but approximately $14,000 in cash which he seized. He also seized a revolver in view on a shelf on the table.

Thompson then inquired once more as to the whereabouts of the passports, and she responded that the only other place they could be was in the safe. She proceeded with Thompson and O'Leary to the safe, opened it, and pointed to the passports. Thompson picked them up. O'Leary at that time noticed in the safe a plastic shopping bag with money protruding from it. He seized the bag and found it to contain approximately $37,000. He also saw in the safe and seized an automatic pistol. Next to the safe were two briefcases and two

plastic bags, all of which he seized. He opened the briefcases and saw that they contained electronic equipment.

At this point Ms. Praetorius was highly upset, "noticeably nervous, shaking" (Tr. 195), so that Thompson thought it appropriate to accompany her to another room to calm her. There she asked what the charges entailed, and Thompson relied he did not know.

At no time during the officers' visit to the house did they advise her she was under indictment.

Charles and Diann Praetorius moved to suppress the items seized and the photographs taken by the officers of the interior of the house on the ground that their rights under the Fourth Amendment to the United States Constitution had been violated. The Praetoriuses further moved to suppress the statements made by Diann Praetorius on the ground that her Fifth and Sixth Amendment rights had been violated.

The Fourth Amendment provides

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrant shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Without a valid consent by Ms. Praetorius the search of the house and the seizures would be "unreasonable" within the meaning of the Fourth Amendment. The officers had no warrant, and the government does not urge that any exigent circumstances required immediate action. The government did contend at the suppression hearing that Ms. Praetorius made a valid oral consent to a search.

■ This court has set forth in *United States v. Iovine,* 444 F.Supp. 1085 (E.D.N.Y. 1978), its view of the considerations at stake when a search is sought to be justified as consistent with the Fourth Amendment by reason of a consent. Even though the consent is "voluntary" in the sense that it

represents a rational and deliberate choice among alternatives, the consent will not be deemed effective where it has been obtained by unfair means. 444 F.Supp. at 1088. The Fourth Amendment protects against the use of such means by the police. The evidence, if seized without effective consent, must be suppressed, because only in that way can unjustified police conduct be discouraged. *United States v. Garcia,* 450 F.Supp. 1020 (E.D.N.Y.1978).

■ The court holds that Ms. Praetorius' oral consent was obtained by means and under circumstances which make it invalid and that therefore the search was "unreasonable" as that word is used in the Fourth Amendment.

In order to give an effective consent Ms. Praetorius would have had to have made a knowing, informed and intelligent decision. Yet she was not informed by the officers that she was under indictment, indeed, that she had been jointly indicted with her husband and others for, among other things, conspiracy to import heroin into the United States. Since at the time of her arrest she was already an indicted defendant she was then entitled to the assistance of counsel.

The Sixth Amendment recites, in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense."

*Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), held that the use as evidence of a defendant's incriminating words, which federal agents had elicited from him after indictment and in the absence of his retained counsel, violated his right to counsel embodied in the Sixth Amendment.

*United States v. Satterfield,* 558 F.2d 655 (2d Cir. 1976), *rehearing en banc denied* August 12, 1977, held incriminating statements made by a defendant even after he had been told he had been indicted and after he had been advised of his *Miranda* rights were inadmissible since he had not knowingly and intelligently waived his Sixth Amendment rights. The court said

that even if the defendant's statements were "voluntary" for purposes of the Fifth Amendment, they were "involuntary" with regard to "the higher standard with respect to waiver of the right to counsel that applies when the Sixth Amendment has attached." 558 F.2d at 657.

If, as the Supreme Court said in *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972), a defendant's right to counsel attaches "at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment," then Ms. Praetorius had a right to counsel after she had been indicted and was then the subject of a "prosecution." But when the officers came to her house they did not even advise her that she had been indicted.

After indictment Ms. Praetorius was no longer a mere suspect, and the officers were no longer making general inquiries into an unsolved crime. She was an accused, and the officers were engaged in a form of pre-trial preparation and discovery. *United States ex rel. Lopez v. Zelker,* 344 F.Supp. 1050, 1053 (S.D.N.Y.), *aff'd,* 465 F.2d 1405 (2d Cir.), *cert. denied,* 409 U.S. 1049, 93 S.Ct. 529, 34 L.Ed.2d 501 (1972). Indeed, while this court does not believe that the motive of the officers is relevant, the court finds that Yanniello's purpose in *instructing* them to tell the defendants arrested that their bail would turn on production of their passports was to obtain relevant evidence and not to aid the defendants. The government had no interest in seeing the defendants at large.

The evidence presented by the government at the hearing fell far short of demonstrating a knowing, informed and intelligent waiver of counsel. Ms. Praetorius was hardly in a position to appreciate the significance of the absence of counsel or to assess the merits of whether, without counsel, she should make statements and lead the officers around the house from place to place in search of the passports.

Once she was under indictment the officers were no longer entitled to pose as her friends. The advice they gave her as to the desirability of securing the passports could not help but be interpreted by her as designed to assist her rather than as intended to lead to the discovery of evidence.

In order to establish a waiver of counsel the officers at least would have had to have explained that she was being prosecuted and that she was entitled to counsel at every stage of that prosecution, and to have spelled out something of the significance of counsel and the dangers of proceeding without counsel. They did none of this but instead gave her advice which had the likely, and as it developed the actual, effect of leading the officers to evidence against her.

There was no showing by the government that Ms. Praetorius had ever been engaged in previous criminal proceedings or that she made a calculated determination to waive counsel. Indeed, she obviously was not in possession of the information necessary to make that decision intelligently.

The court therefore holds that the search was "unreasonable" because it was made without an informed and intelligent consent. The court need not, and does not, decide whether Ms. Praetorius waived her *Miranda* rights.

Ms. Praetorius has asked the court to find that the officers deliberately delayed her arrest until after her husband was arrested so that she could not call him. The court declines to find that the officers had such a motive.

Ms. Praetorius also asks the court to characterize the consent as obtained by "fraud." The initial statement by Ms. Praetorius inviting the officers to look where they wished was not occasioned by the officers' advice as to the passports. As to that advice the court does not believe the motive of the officers is pertinent. However, that advice, while perhaps substantially but not entirely accurate as a prediction, seriously misled her as to her own interests. Since the court holds that the consents were invalid because made in the absence of counsel after indictment, there is no occasion to find whether the consents would have been valid absent an indictment.

The government also urges that the *Massiah* and *Satterfield* cases should apply only to the statements made by Ms. Praetorius and not to the evidence seized. There is nothing in the Constitution which justifies that distinction. If Ms. Praetorius was entitled to counsel at all discovery proceedings after the indictment and the commencement of the prosecution, it matters not whether the pre-trial discovery takes the form of a search or of an elicitation of statements. *United States v. Wade,* 388 U.S. 218, 226, 87 S.Ct. 1926, 1932, 18 L.Ed.2d 1149 (1967), established the "principle that in addition to counsel's presence at trial, the accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial" (footnotes omitted). If a post-indictment lineup is, as the court held in the *Wade* case, a critical stage of the prosecution at which a defendant is entitled to counsel, surely so is a postindictment request to search the defendant's premises.

Finally the government contends that even if the evidence seized is inadmissible against Ms. Praetorius it may be used against her husband. The argument is that the items, if excludable, are so because of a violation of Ms. Praetorius' Sixth Amendment right to counsel, a right which is personal to her and which Mr. Praetorius may not assert, and that the search itself was "reasonable" even as to her and therefore comported with the Fourth Amendment. The government points to the language in the *Massiah* case which states that admissions obtained from an indicted defendant who has not waived counsel, while they may not be admitted against that defendant, may be utilized against others who have no standing to object to his lack of counsel. 377 U.S. at 207, 84 S.Ct. 1199. In other words, the court held that the Sixth Amendment prohibited not the questioning of the accused but the use against him of the statements elicited.

But in the present case there is no contention that Ms. Praetorius' oral consent to "look anywhere you wish" was incriminating or identified evidence against her. Her statement was significant only if it justified what would otherwise be an "unreasonable" search. It may be, as the government argues, that her Sixth Amendment rights were not violated by the mere asking for consent, provided that nothing that was evoked by the question was used in her prosecution. Here, however, evidence obtained was not the fruit of the consent but of the search. Indeed, after Ms. Praetorius had refused to sign the written consent the officers did not treat her oral invitation to look wherever they wished as a consent to search the house. They simply followed her around in quest of the passports which they had suggested she secure. Only after the event did the government suggest that she had made a valid blanket consent. Even in a "but for" casual sense her statement did not lead to the discovery of evidence.

The Fourth Amendment does not speak of proceedings in court and is not a protection merely to those accused of crime. It protects the interest of every person in their own privacy. Any person may decide to forego that right, but if that decision is to be effective it must be made under circumstances which do not offend our sense of fairness. One who is indicted, though assumed to be innocent, has no greater constitutional interest in privacy than any other person. But an innocent indicted person, if properly informed, may appropriately wish to take into account additional factors before concluding to abandon her right to privacy. It is unfair to allow her to waive that right in ignorance even of the fact that she has been indicted, of her right to counsel, and of the significance to her of the protection of counsel.

In short, the evidence is suppressed in this case because it is the result of an "unreasonable" search within the meaning of the Fourth Amendment. It cannot be justified by Ms. Praetorius' statement telling the officers to look where they wished since that statement was made in ignorance of the fact that she had been indicted and

in the absence of an intelligent waiver of her Sixth Amendment right to counsel.

Since the house was that of both Mr. & Ms. Praetorius and since the items seized evidently belonged to him, he has standing to raise the issue of the unreasonable search. *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).

The evidence will be suppressed.

So ordered.