**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Richard Gene JOHNSON, Patricia Stern Maggs, Allen Eugene Vanecek, Vickie Lynette Winter, Whose True Name Is, Dawn A. Goodhead, Defendants-Appellants.**

Nos. 80–1728, 80–1738, 80–1801 and 81–1096.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 4, 1981.

Decided Nov. 6, 1981.

Rehearing Denied Dec. 18, 1981.

Certiorari Denied Jan. 18, 1982.
See 102 S.Ct. 1263.

H. Dean Steward, San Diego, Cal., for Maggs and Goodhead.

Stuart L. Smits, San Diego, Cal., for Vanecek and Johnson.

Judith S. Feigin, Asst. U. S. Atty., argued; M. James Lorenz, U. S. Atty., Judith S. Feigin, Asst. U. S. Atty., on the brief, San Diego, Cal., for United States.

Before CHAMBERS and ANDERSON, Circuit Judges, and WHELAN,* District Judge.

CHAMBERS, Circuit Judge:

Appellants were convicted, on stipulated facts, of conspiracy to possess a controlled substance with intent to distribute, in violation of 21 U.S.C. § 846, and possession of a controlled substance with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). They now appeal denial of pretrial motions to suppress evidence. Additionally, Goodhead claims the trial court erroneously considered evidence which was not incriminating, and that such consideration was prejudicial. We find no merit in any of the points appealed.

On May 7, 1980, a Drug Enforcement Administration, (DEA), officer in Oregon notified agent Meisner of the San Diego County Integrated Narcotics Task Force, (NTF), that Richard Johnson, a suspected dealer of cocaine in Eugene, Oregon, and a companion were traveling to San Diego. The DEA agent suspected the purpose of the trip was to purchase cocaine. He advised Meisner that Johnson had a history of violent crime and had been involved in the shooting of a police officer, and the pistol-whipping death of another person.

Meisner and four other NTF agents followed the suspects upon their arrival in San Diego. The suspects took a taxi to the area of 2169 Pine Street. The suspects left the taxi and walked the remaining distance to the residence. Upon their knocking, an inhabitant responded that they had been waiting for them. Johnson's companion was Vanecek.

Meisner was able to observe activities inside the house through an open window while standing on public property. He observed Johnson counting objects on the dining room table. Vanecek picked up two bundles, pulled a bill from one, and rolled it into a straw. Vanecek placed one end of the straw to his nose and the other to the table. Meisner, a ten year veteran of nar-

cotics enforcement, believed Vanecek was inhaling cocaine or some other controlled substance. Vanecek then picked up a bag of white powder and took it into the kitchen where he mixed it with baking soda. He returned to the dining room where Maggs and Johnson joined him. Johnson went into the kitchen and returned with a bag of white powder. Vanecek put bundles of money into a bag on the table. Meisner's surveillance took about 15 minutes between 10 p. m. and 10:30 p. m.

While Meisner was observing the activities in the Pine Street house, other neighborhood residents became aware of unusual activities in the neighborhood. One neighbor telephoned Mr. Alvin Ray, who lived directly across from the suspects' house. Ray contacted the police concerning the "prowlers." He then stood on his porch to intimidate them.

At approximately 10:27 p. m., a man and a woman arrived at the house by auto. The man carried a brown paper bag into the house. Johnson, Vanecek and Maggs, along with the newcomers, Goodhead and Lopez, sat around the dining room table. Lopez drew five large plastic bags of white powder from the bag. Each plastic bag appeared to contain between a pound and a kilo of substance suspected to be cocaine.

At this point Meisner notified the other agents that he believed a narcotics transaction was taking place, and that he thought the participants would be departing shortly. Meisner suggested securing of the residence to insure that evidence not be destroyed and that the suspects not escape. Meisner and his party consisted of five officers. He knew there were at least five suspects, and four exits from the house. Only two of the exits could be seen from public property. Additionally, Meisner believed the suspects had three cars available to aid in escape.

Meisner radioed the back-up support from local authorities before approaching the house. A local television news team arrived, and the police support arrived shortly thereafter. When the television

---

* The Honorable Francis C. Whelan, United States District Judge for the Central District of California, sitting by designation.

news crew arrived, Meisner determined that the exigencies required action. He sought and gained entry to the house.

At 11:10 p. m., after entering and securing the house, evidence and suspects, Meisner proceeded to obtain a search warrant. At 12:42 a. m., he participated in a conference call with a municipal judge and a deputy district attorney. Meisner recited all the information justifying a warrant, and at 1:03 a. m., the search warrant issued.

The search of the house revealed 11 pounds of cocaine, about $75,000 cash, a gun, cocaine sales records, and other drug related paraphernalia. Everyone in the house was arrested. While arresting the suspects, the agents discovered that one of the suspects was a Colombian citizen. Meisner then determined to turn the case over to federal authorities because of its international and interstate implications.

An additional warrant was issued for the search of another house where evidence against Goodhead was found. The warrant issued based on an affidavit from William Flores, a NTF agent. The affidavit recited the facts of the surveillance and subsequent arrests, and additionally, included information connecting both Goodhead and Lopez to the second (Ingraham Street) house.

Among the monies discovered on the suspects and at the Pine Street house, was an amount of approximately $1,800 found on Goodhead's person. This sum was from a nondrug related transaction.

In response to defendants' various pretrial suppression motions, the Federal Magistrate personally inspected the Pine Street location. He found, *inter alia*, 1) the five surveillance agents were an inadequate number to properly surveil the four exits of the Pine Street residence or the five known suspects if they attempted to leave, 2) that at least one suspect had a history of violence, 3) not all the exits to the house were visible from public areas, 4) a large narcotics transaction had taken place, 5) narcotics traffickers usually leave shortly after a transaction, 6) some or all of the evidence would be lost if the suspects left the house, 7) suspects whose identity was unknown were likely to escape if they decided to leave, 8) securing the residence avoided safety problems for the agents and the community, 9) a warrant to search could not be obtained for about two hours, 10) neighbors were aware of unusual police activity, and 11) a television news crew had arrived at the scene. The magistrate concluded that these facts showed exigent circumstances justifying warrantless entry into the Pine Street residence.

On appeal appellants contend the magistrate erred in concluding that exigent circumstances existed to justify warrantless entry into the Pine Street house. The existence of exigent circumstances is a question of fact, and "the proper standard of review of a finding regarding exigent circumstances is whether the finding was clearly erroneous." *United States v. Flickinger*, 573 F.2d 1349, 1356–1357, (9th Cir. 1980) (footnote omitted). This court must determine, in reviewing the findings of the district court, whether "on the entire evidence [it] is left with the definite and firm conviction that a mistake has been committed." *Id.* at 1357.

"Exigent circumstances are those in which a substantial risk of harm to the persons involved or to the law enforcement process would arise if the police were to delay a search until a warrant could be obtained. The need for the search must be apparent to the police, and so strong as to outweigh the important protection of individual rights provided by the warrant requirement." *U. S. v. Gardner*, 627 F.2d 906, 909 (9th Cir. 1980), citing, *U. S. v. Robertson*, 606 F.2d 853, 859 (9th Cir. 1979).

Moreover,

"exigency does not evolve from one single fact. We are often confronted with a mosaic—no one part of which is itself sufficient." 573 F.2d at 1354.

In the instant case the magistrate found, as a matter of fact, after personal inspection of the area and premises seized, that agent Meisner reasonably concluded that, if the suspects had discovered the police activity and tried to escape, he would have been unable to prevent the escape or otherwise apprehend the suspects. The

magistrate further concluded that the risk of discovery was growing ever greater, especially after the arrival of the television news crew. These facts, compounded by the inability of the surveilling officers to observe all of the exits from the house, cause us to conclude that exigent circumstances existed, and warrantless entry into the house was justified.

Appellants argue, however, that the exigent circumstances were the product of the officers' misfeasance. They argue that additional agents could have been requested and these additions would have allowed adequate surveillance until a warrant could be obtained. This argument is belied by the record. The greatest threat to the security of the operation was the arrival of the television news team, and the awareness among the neighbors of the police activity. Agent Meisner *did* request support officers, but the news team arrived *before* the back-up group. At that point, at least, the possibility of detection and subsequent escape became so great as to justify securing the residence. Appellants have not shown the magistrate to have been clearly erroneous.

The second point raised here is that the fruits of the search of the Pine Street residence should be suppressed because the warrant was not obtained in the manner prescribed by Rule 41 of the Federal Rules of Criminal Procedure.[1] Even granting appellants' contentions that the rule was not followed, the evidence should not be suppressed.

■ "Only a 'fundamental' violation of Rule 41 requires automatic suppression, and a violation is 'fundamental' only where it, in effect, renders the search unconstitutional under traditional fourth amendment standards." *U. S. v. Vasser*, 648 F.2d 507, 510 (9th Cir. 1980). Where the alleged violation of Rule 41 is not "fundamental" suppression is required only where:

"(1) there was 'prejudice' in the sense that the search might not have occurred

or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision of the Rule." *Id.,* (citations omitted).

In the instant case appellants make no argument that the warrant at issue was "fundamentally" infirm. Appellants rely only on technical grounds for requiring suppression of the evidence seized under the warrant. There is no merit to appellants' contentions.

■ The record shows that the warrant was proper under state procedure: the only infirmity is the lack of a federal magistrate issuing the warrant. No argument is made that the search would not have occurred, nor any that the search would have been less abrasive if a federal magistrate had issued the warrant. Similarly, no serious argument is raised that the agents intentionally and deliberately disregarded the rule. The agents met and discussed whether a federal warrant was necessary, and concluded that it was not. The magistrate found that the agents' decision was in good faith, and appellants have not demonstrated "clear error."

■ Appellants' contention that the affidavit in support of the search warrant for the Ingraham Street house was inadequate is meritless. Goodhead was arrested as a participant in a major narcotics transaction. The affidavit stated so and stated the officer's belief, based on his experience, that additional evidence would be found at her residence. Additionally, another of the participants in the transaction had documents indicating that he also resided at the Ingraham residence. This court has held similar information sufficient to support a warrant in *U. S. v. Dubrofsky*, 581 F.2d 208 (9th Cir. 1978); *see, U. S. v. Allen*, 633 F.2d 1282 (9th Cir. 1980).

■ Goodhead brings one issue separately. She asserts that the court improperly considered the $1,800 found on her

1. "Rule 41 Search and Seizure
 *   *   *   *   *   *
(2) Warrant upon oral testimony.—
(A) General Rule.—If the circumstances make it reasonable to dispense with a written

affidavit, a Federal Magistrate may issue a warrant based upon sworn oral testimony communicated by telephone or other appropriate means."

person as evidence to convict her. Under the plain error rule "we would reverse only if it were *highly probable* that the error materially affected the jury's verdict." *U. S. v. Dixon*, 562 F.2d 1138, 1143 (9th Cir. 1977). The possibility of "material effect" of any error is less in a court trial on stipulated facts. There is no possibility that the $1,800 *materially* affected this verdict.

The district court is affirmed.