**UNITED STATES of America,**

v.

**Ahron DAVID, Defendant.**

No. 83 CR 85.

United States District Court, E.D. New York.

June 13, 1983.

Raymond J. Dearie, U.S. Atty., Brooklyn, N.Y. (Mark A. Summers, Asst. U.S. Atty., Brooklyn, N.Y., of counsel), for plaintiff.

Ivan S. Fisher, New York City, for defendant.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Defendant Ahron David moves to suppress guns, ammunition, money and personal papers seized in his apartment on March 23, 1983, allegedly in violation of his fourth and sixth amendment rights. Prior to the seizure he had been indicted in five counts for violation of the federal drug laws.

At a hearing the following facts were adduced. At about 3:00 p.m. on March 23, 1983, Special Agent Christopher Giovino of the Drug Enforcement Administration made a phone call to David's apartment. A man with an Israeli accent answered, and Giovino hung up. Before making the call Giovino had asked agents to proceed to David's residence. At about 3:30 p.m. Giovino, his group supervisor, and other agents arrived at David's apartment house at 247 East 28th Street, Manhattan. The doorman told them that David and a female were in his apartment. The agents showed the building superintendent an arrest warrant for David. When there was no response to a buzz to David's apartment, the doorman told the agents that David frequently did not answer his buzzer.

Giovino, the superintendent, the group supervisor, two or three agents and a state police investigator then went to the door of the apartment. The group supervisor and the investigator put their ears to the door and thought they heard a television set inside. After knocking on the door and receiving no response for three or four minutes, the agents were told by the superintendent that David did not always answer the door.

After they said that they would break the two locks, the superintendent offered to unlock one with his passkey and drill out the other. After this was done, the agents entered, conducted a room to room search, found no one in the apartment, but discovered a sawed off shotgun and a high powered rifle on the bedroom floor and a BB pistol on a living room table. The television set was on at a low volume.

The group supervisor and the investigator remained in the apartment while some agents moved to the hallway and others went to the front of the building to intercept David should he reenter. After the agents had unsuccessfully searched the vicinity of the building, the doorman told Giovino that David was in a pizzeria across the street. Meanwhile, the officers in the apartment advised Giovino by walkie-talkie that they were detaining David's brother and a female, both of whom had attempted to enter the apartment.

Agents went to the pizzeria door and motioned to David to step outside. When he did so, the agents identified themselves and told him he was under arrest. Since people had started to congregate near the point of arrest, the agents walked David back to the apartment building and took him upstairs in the elevator. They read him his *Miranda* rights and told him that a grand jury had indicted him for a narcotics violation, that he should not volunteer any information, and that the agents were bound not to ask him questions pertaining to the charges. David initially declined to go up to his apartment, for which he said they needed a warrant. After Giovino told him that an unidentified female was being detained in his apartment, defendant no longer resisted.

Upon entering the apartment, David identified his brother and identified the female as a Ms. Van Laere. Suspecting that Van Laere, who had difficulty speaking English, was not a United States citizen, Giovino asked for her identification. When she could not produce an alien registration

card, David said her passport was locked in the safe in the bedroom. Giovino then told David that she would be held until identification was provided or until the immigration authorities verified her status. David responded that he would open the safe to get her papers but that he did not wish the agents going into the safe. Giovino asked "Why not?" (Tr. 34). David replied, "Because there is a gun, a lot of money in there and I don't want you seeing it or taking it." Giovino said he would not permit David to put his hand in the safe and pull out whatever he wanted. David did not then open the safe.

Giovino then telephoned Assistant United States Attorney Mark Summers, who told Giovino that "hopefully within an hour" he would get a search warrant for the premises, particularly the safe. Summers told Giovino to remind David not to volunteer any statements.

Giovino then told David that a search warrant was being drawn up and that "regardless of how he wanted it" the agents were going to get into the safe when the warrant arrived. David responded that, if they were going to get a warrant, they might as well search the apartment, and that he would open the safe and get Van Laere's papers. Although Giovino feared that David might pull a gun from the safe, he allowed David to open the safe and take a passport from the front of the safe. While David opened the safe, an agent held a gun to David's head. Although David attempted to position himself so that the agents could not see inside the safe, Giovino was able to see a gun butt in the safe. After David handed Giovino the passport, the agents seized from the open safe three guns, ammunition, a large sum of money, and a stack of papers including passports. The agents then searched the rest of the apartment but seized no other items.

Defendant argues first that all items seized are tainted because the agents lacked either probable cause to believe, or a reasonable belief, that he was in the apartment at the time of the forcible entry. In *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371,

63 L.Ed.2d 639 (1980), the Supreme Court held that absent an arrest warrant, exigent circumstances, or consent, police officers could not constitutionally enter a suspect's home to arrest him. Although the Court noted that the *Payton* case did not raise the question whether the police had *probable cause* to believe that the suspect was at home when they entered, *id.* at 583, 100 S.Ct. at 1378, the Court stated in dictum that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives *when there is reason to believe the suspect is within.*" *Id.* at 603, 100 S.Ct. at 1388 (emphasis added). In *United States v. Manley,* 632 F.2d 978, 983 (2d Cir.1980) (execution of arrest warrant on third party's premises), the Second Circuit noted that the standard of reasonable belief that the arrestee will be found in the dwelling "may require less justification than the more familiar probable cause test."

 It does not matter which standard is applied. When they entered, the agents and officers had probable cause to believe that David was in the apartment. Thirty minutes earlier a man with an Israeli accent had answered the phone. The doorman told the agents that David was in his apartment with a female companion and that he frequently did not answer his buzzer. The superintendent told the agents that David did not always answer his door. Finally, the group supervisor and the police investigator heard through the door the sound of what was apparently a television set. Probable cause does not require certainty. Here the agents had "a reasonable, objective basis for *belief*" that David was inside. *United States v. Webb,* 623 F.2d 758, 761 (2d Cir.1980) (emphasis in original). The entry was lawful, and the items in plain view were properly seized.

 Defendant argues that even if the entry was lawful, the agents seized the items from the safe in violation of his sixth and fourth amendment rights. *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), held that the government violated an indicted defendant's sixth

amendment right to counsel by deliberately eliciting incriminating information from him in the absence of counsel. This court, in *United States v. Praetorius,* 457 F.Supp. 329 (E.D.N.Y.1978), held that the reasoning of the *Massiah* case applies not only to incriminating statements elicited from indicted defendants but also to consents to search. Incriminating statements and the fruits of searches based on consent are admissible only if the defendant has previously made a valid waiver of his right to counsel. Moreover, the Second Circuit in *United States v. Mohabir,* 624 F.2d 1140, 1153 (2d Cir.1980), held that "a valid waiver of the Sixth Amendment right to have counsel present during post-indictment interrogation must be preceded by a federal judicial officer's explanation of the content and significance of this right."

Defendant urges that under the holdings of the *Praetorius* and *Mohabir* cases the court should suppress the items found in the safe, because whatever consent David gave was not preceded by a judicial officer's explanation of his sixth amendment rights. Alternatively, defendant contends that he did not consent to a search of the safe because he opened it only to get Van Laere's passport and expressly declined to permit a further search. Defendant argues that in any event the circumstances under which he opened the safe, namely, his agitation over the detention of Van Laere, Giovino's assertion that because a warrant was on its way a search was inevitable and the fact that an agent had a gun at David's head, show that the agents unfairly induced him to open the safe.

The government, citing *United States v. Candella,* 469 F.2d 173 (2d Cir.1972), contends that by telling the agents what was inside the safe David either consented to a seizure or did the equivalent of revealing the contents to plain view. In that case agents arrested Candella in his residence for illegally transporting handguns and asked him whether he had any of the guns. He replied that they were in a box some five feet from where he stood. The Second Circuit upheld the seizure on the theories that Candella's statement amounted to a consent to seizure, or that his "statement that the guns were in the containers was the equivalent of his opening the containers for the agents' inspection," in effect exposing the guns to "plain view". *Id.* at 175.

The government says that David voluntarily and unexpectedly disclosed the presence of guns and money in the safe in response to the agents' legitimate questions regarding Van Laere's immigration status, and that the disclosure amounted either to voluntary consent or to an inadvertent plain view sighting by the agents.

The government contends that, for similar reasons, the agents did not overstep the limits of the *Massiah* rule because they did not "deliberately elicit[ ]" incriminating information from David. 377 U.S. at 206, 84 S.Ct. at 1203. The government says that the agents questioned him only about the immigration status of Van Laere and could not have anticipated that their inquiries would lead to evidence relevant to the charges in the indictment.

■ In determining whether after indictment a government agent has "deliberately elicited" incriminating statements the Supreme Court in *United States v. Henry,* 447 U.S. 264, 270, 274, 100 S.Ct. 2183, 2186, 2189, 65 L.Ed.2d 115 (1980), found a sixth amendment violation where the government "intentionally creat[ed] a situation likely to induce [a defendant] to make incriminating statements without the assistance of counsel." In the *Henry* case the statements were made to a paid informer sharing a cell block. Here the statements were made in response to an inquiry which the agents had every reason to believe might provoke an incriminatory response. After David told the agents that he would open the safe to get Van Laere's papers but that he did not wish the agents to go into it, the agents should have known that any further questioning about the safe invited an incriminating answer. Prior to the incident Giovino had obtained information that the safe from time to time contained drugs (Tr. 51). At the hearing, Giovino testified "I as-

sumed that or I thought that there may be drugs in that safe at anytime." (Tr. 53).

Under these circumstances to press David with the question as to why he refused to allow the agents into the safe was tantamount to asking information relevant to the charges in the indictment. Because David did not knowingly and intentionally waive his sixth amendment right to counsel, *see United States v. Mohabir, supra,* admission of the incriminating statement that the safe contained guns and money would violate that right.

The same reasoning applies to the evidence revealed in the safe. What the agents said was calculated to cause David to open it. Even before his statement as to the contents, the agents told him that his female companion would be held until her identification, then known by the agents to be in the safe, was produced, and, after he revealed what it held, they said that "regardless of how he wanted it" they would get into the safe when the warrant arrived. They did not tell him that issuance of the warrant depended on the decision of a magistrate.

█ Under the reasoning of the *Henry, Mohabir,* and *Praetorius* cases, before an indicted defendant is intentionally placed by the government in a situation likely to induce him to perform acts revealing incriminating evidence, he must make a knowing and intentional waiver of his right to counsel. David plainly did not make such a waiver.

The foregoing constitutes the court's findings of fact and conclusions of law.

The items seized from the safe are suppressed. Defendant's motion is otherwise denied. So ordered.