**UNITED STATES of America**

v.

**Jose Santa-Cruz LONDONO; Jose Omar Sanchez; Jairo Escobar; Fouad Hazzi; Angelica Carvajal; Soffy Mejia Carvajal; Luz Marina Carvajal; and Luis Soto Garcia, Defendants.**

**No. 85 CR 596(S).**

United States District Court,
E.D. New York.

May 4, 1987.

---

Barry Ivan Slotnick, New York City, (Richard A. Medina, of counsel), for Sanchez.

Stephen P. Scaring, Mineola, N.Y., for Escobar.

David S. Zapp, New York City, for Luz Marina Carvajal.

James DiPietro, New York City, for Sophie Mejia Carvajal.

Andrew J. Maloney, U.S. Atty., E.D. N.Y., Brooklyn, N.Y. (Ephraim Savitt, Asst. U.S. Atty., of counsel), for U.S.

## MEMORANDUM AND ORDER

McLAUGHLIN, District Judge.

Defendants are named in a ten-count indictment charging various violations of the narcotics laws. Several defendants have moved to suppress evidence obtained during the course of searches. Hearings were held over seven days. I have carefully considered the testimony and the pre- and post-hearing submissions of the parties. The following constitute the Court's findings of fact and conclusions of law.

### I. *Escobar*

#### A. *Findings of Fact*

At approximately 8 p.m. on October 29, 1985, several officers of the New York Drug Enforcement Task Force ("NY-DETF") were waiting outside a house at 64–30 211th Street in Bayside, Queens in order to effectuate the arrest of defendant Jairo Escobar. The officer nearest the scene, Detective Dennis Casey, observed a man park a vehicle in the driveway and walk to the residence. Although the man's face was not visible in the dark, Detective Casey determined, based on what he knew about the defendant's home and car, that the man was Escobar. He alerted his fellow officers by radio and, at approximately 8:15 p.m., proceeded to the front door, accompanied by Group Supervisory Agent Gerard Murphy. A woman answered the door but tried to shut it after the officers identified themselves as police. They pushed their way into the house with guns drawn, placed defendant Escobar under arrest, and advised him of his *Miranda* rights.

The back-up officers then entered the house and began a security sweep to ensure that no other persons were present. Police Investigator Richard Heathwood entered a second-floor bedroom and noticed a low door leading to an unfinished attic-type room. He there observed a metal safe or strongbox. He also noted, as he was leaving the attic, that a block-shaped object had been shoved into a two-inch gap running along the top of the door leading back to the bedroom. Fearing the block might be a weapon, Heathwood flicked it with his finger, causing it to fall to the floor. He then realized that it was a package of currency later determined to total $10,300.

Heathwood brought the money to the kitchen, where Casey and Escobar were located. In response to Casey's question, Escobar stated that the bedroom leading to the attic was his. Casey then asked Escobar for consent to search the house. Escobar agreed, but refused to sign a form to that effect. Later on, when Escobar's mother arrived home, she too consented to a search but would not sign the form. Both defendant and his mother stated that they did not know the combination to the safe in the attic.

No search took place at that time. Instead, at approximately 8:45 p.m., Casey telephoned Assistant United States Attorney ("AUSA") Ephraim Savitt. It was determined that a search warrant would be sought. Because the late hour necessitated a telephone application, Casey called

Special Agent Mark Moger at the NYDETF offices, where recording equipment was available. Casey informed Moger of the evening's events, so that Moger could serve as affiant for the warrant. Meantime, AUSA Savitt called United States Magistrate John L. Caden and briefly described the situation. The Magistrate chose not to hear the application, so AUSA Savitt attempted to contact United States District Judge Henry Bramwell, to whom the case was assigned at the time. When he finally succeeded, he informed Judge Bramwell of the nature of the application and advised him that Magistrate Caden had earlier declined to authorize the search. Judge Bramwell agreed to hear the government's request. Because none of the participants had recording equipment, neither of Savitt's conversations was recorded.

A three-way telephone call among the Judge, AUSA Savitt and Agent Moger was arranged, with Moger recording the call at the NYDETF office. The government sought to search only the bedroom and attic area, including the safe. Savitt and Moger informed Judge Bramwell that information from confidential sources indicated that Escobar was a principal operative of a major narcotics distribution organization using "stash" locations where large amounts of cocaine and cash were stored in safes. They further stated that Escobar, who had been indicted, had just been arrested in his home pursuant to a warrant, and that during a security sweep the officers had discovered a safe and a large quantity of cash. They added that the defendant and his mother had consented to a search but claimed not to know the combination to the safe. Finally, they asserted that in the officers' experience, it was likely that evidence of narcotics trafficking would be found in the safe and the attic/bedroom area.

Judge Bramwell authorized the search at approximately 11:40 p.m. The officers executing the warrant discovered cash and jewelry, as well as false identification documents and a memo book listing information relating to customers of the Jose Santa-Cruz Londono cocaine trafficking organization.

## B. *Conclusions of Law*

Defendant objects to several aspects of the search. First, he contends that the officers purposely waited to arrest him inside his home so that they could search there. Second, he argues that the $10,300 was discovered during an unlawful warrantless exploratory search. Third, he contends that his statement that the bedroom was his was elicited in violation of his right to counsel and that his consent to search is similarly defective. Because defendant regards each of these alleged defects as fatally tainting the search, he believes all items discovered should be suppressed.

### 1. *Timing of Arrest*

I find the officers' decision to arrest defendant Escobar inside the home to be entirely reasonable. It is, of course, conceded that agents may not delay an arrest in order to gain access to an area they wish to search. *See United States v. Artieri*, 491 F.2d 440, 443 (2d Cir.1974), *cert. denied*, 419 U.S. 878, 95 S.Ct. 142, 42 L.Ed.2d 118 (1975). This case does not, however, present the type of "planned plain view" condemned by the Supreme Court in *Coolidge v. New Hampshire*, 403 U.S. 443, 471 n. 27, 91 S.Ct. 2022, 2041 n. 27, 29 L.Ed.2d 564 (1971). It must be remembered that, as he sat outside 64–30 211th Street, Detective Casey could not see the face of the man who parked the car in the driveway. Casey did not conclude that it was in fact the defendant until Escobar had reached the house. He then alerted fellow officers and arranged a plan of approach. These steps were reasonable and necessary to assure a safe and effective execution of the arrest.

Law enforcement agents are not required to pounce the moment a person who *might* be the suspect appears. Such a rule of derring-do would not only endanger officers, defendants, and passers-by, but would also encourage the police to accost individuals without knowing whether they are the suspects. There is no evidence here that the agents were motivated by anything but

caution; the timing and location of the arrest were proper.

### 2. *Exploratory Search*

■ Once properly inside the home to effect the arrest, *see Payton v. New York*, 445 U.S. 573, 603, 100 S.Ct. 1371, 1388, 63 L.Ed.2d 639 (1980), the officers were entitled to conduct a security sweep, looking for persons who might pose a threat to their safety or destroy evidence, *see United States v. Gomez*, 633 F.2d 999, 1008 (2d Cir.1980), *cert. denied*, 450 U.S. 994, 101 S.Ct. 1695, 68 L.Ed.2d 194 (1981).

Defendant contends that the $10,300 was not properly seized pursuant to the security check, correctly pointing out that such a search should be "cursory in nature, and ... intended to uncover only 'persons, not things,'" *United States v. Agapito*, 620 F.2d 324, 336 (2d Cir.) (quoting *United States v. Bowdach*, 561 F.2d 1160, 1168 (5th Cir.1977)), *cert. denied*, 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980). This argument misperceives the basis on which the government seeks to justify the seizure of the cash. It is contended not that officers may search for evidence during a security check, but rather that they may seize objects that are discovered in plain view during the course of such a sweep.

■ The plain view doctrine permits the warrantless seizure of an object if, at the time it is observed, three conditions are met: the officer is lawfully on the premises, the discovery is inadvertent, and the incriminating nature of the object is immediately apparent. *See Coolidge, supra*, 403 U.S. at 465–74, 91 S.Ct. at 2037–42. In this case Investigator Heathwood was lawfully in the attic conducting a security sweep, and he serendipitously spied the block of money at eye level as he exited the door over which it was stashed.

It is a closer question whether the incriminating nature of the money was immediately apparent to him. Heathwood admitted that initially he did not know what the block-shaped object was. His interest was piqued, however, by its suspect placement, and he thought it might be a weapon, a recognized tool of the narcotics trade, *see*

*United States v. Viserto*, 596 F.2d 531, 537 (2d Cir.), *cert. denied*, 444 U.S. 841, 100 S.Ct. 80, 62 L.Ed.2d 52 (1979). He touched the object with one finger, which caused it to fall to the floor. It was then apparent that the block contained a large amount of cash, of obvious evidentiary value, *see Gomez, supra*, 633 F.2d at 1009. The question, therefore, becomes whether the mere fact that the officer had to "flick" at the block means that he could not have immediately perceived its incriminatory nature and, thus, the third element of the plain view exception is missing.

■ Until recently, this Circuit and others answered that question in the negative. Those courts permitted a cursory inspection—including touching or moving—to determine the significance of items in plain view. *See, e.g., United States v. Marbury*, 732 F.2d 390, 399 (5th Cir.1984); *United States v. Ochs*, 595 F.2d 1247, 1257–59 & n. 8 (2d Cir.), *cert. denied*, 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979). The Supreme Court has now made clear, however, that the "immediately apparent" requirement is not met—and thus the seizure cannot be justified under the plain view doctrine—if the item must be moved even slightly in order to discern its incriminatory nature. The Court in *Arizona v. Hicks*, —— U.S. ——, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987), held that the mere moving of an object is itself a search, *see id.*, 107 S.Ct. at 1152, and requires probable cause, *see id.*, 107 S.Ct. at 1153. This court applies the law as it is at the time of decision, *United States v. Tucker*, 495 F.Supp. 607, 616 n. 10 (E.D.N.Y.1980); *see Byrne v. Buffalo Creek R.R. Co.*, 765 F.2d 364, 366 (2d Cir. 1985), so the $10,300 must be suppressed unless there existed a fair probability that evidence of a crime would be found in the particular location. *See Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983).

■ I conclude that probable cause was lacking. Heathwood candidly admitted that he did not know what the object was. Although there may be situations in which an object's suspicious placement gives rise

to probable cause to search, this is not one of them. No other evidence of criminality was visible, the item itself was unenlightening, and a homeowner secreting an object does not necessarily reflect illegal activity. Thus, because the seizure of the $10,300 cannot be justified by the plain view doctrine, it must be suppressed.

### 3. *Right to Counsel*

■ Noting the rudimentary rule that the right to counsel attaches the moment he is indicted, defendant next argues that because he was arrested after his indictment, his statements—both that the officers could search and that the bedroom leading to the attic was his—were elicited in violation of the sixth amendment. The government concedes as much for purposes of this motion and does not intend to offer defendant's statements at trial. It contends, however, that both statements were properly included in the application for a search warrant, not to establish probable cause, but to explain to Judge Bramwell why the officers sought to search only the bedroom-attic area. My reading of the transcript comports with this view. The statements, proffered as part of a limitation on the scope of the search, do not appear to have affected the probable cause calculus.

### 4. *Suppression*

The sufficiency of the showing of probable cause must thus be assessed without reference to the statements, which the government concedes were not presented to Judge Bramwell for that purpose, or to the cash, which, although properly considered under the law as it stood at the time the application was made, must now under *Hicks* be deemed to have been seized unlawfully.

"To have the evidence seized pursuant to the search warrant suppressed, [defendant] must ... show that there was not a sufficient residue of probable cause to support the warrant, without considering the improper [evidence], and that the agent who conducted the search did not reasonably rely on the warrant." *United States v.*

*Thomas,* 757 F.2d 1359, 1367 (2d Cir.) *cert. denied,* —— U.S. ——, 106 S.Ct. 66, 88 L.Ed.2d 54 (1985).

The "residue" here is: an individual indicted for narcotics trafficking, arrested inside his home, in which a safe—an object often used as a stash location by the organization with which defendant was allegedly affiliated—was discovered in a room off one of the bedrooms. There is also the agents' expert opinion—which the Magistrate can properly consider, *see United States v. Young,* 745 F.2d 733, 758 (2d Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985)—that evidence would be discovered in the house, and especially in the safe. Without the cash or the statements, however, this "residue" is simply insufficient to support a finding of probable cause. Therefore, had the application been made after *Hicks,* the search warrant would not have issued.

Under *United States v. Leon,* 468 U.S. 897, 920–21, 104 S.Ct. 3405, 3419, 82 L.Ed.2d 677 (1984), when an officer acts in objective good faith reliance on a warrant, the fruits of the search are admissible even if, as here, it is later determined that there was no probable cause. Furthermore, " 'a warrant issued by a magistrate normally suffices to establish' that a law enforcement officer has 'acted in good faith in conducting the search.' " *Id.* at 922, 104 S.Ct. at 3420 (quoting *United States v. Ross,* 456 U.S. 798, 823 n. 32, 102 S.Ct. 2157, 2172 n. 32, 72 L.Ed.2d 572 (1982)). Defendant notes that there are at least four situations in which the good faith exception to the valid warrant requirement cannot be invoked: 1) where the issuing magistrate was misled by false information knowingly or recklessly conveyed by the affiant; 2) where the issuing magistrate wholly abandoned his judicial role; 3) where the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and 4) where the warrant is so facially deficient that the officers cannot reasonably presume it to be valid. *See id.,* 468 U.S. at 923, 104 S.Ct. at 3421.

Defendant suggests that the officers' entire course of conduct establishes their bad faith. He argues that they intentionally stalled outside his home and that they intentionally extended the security sweep to search for things in addition to people. I have already found that the timing of the arrest was entirely proper. As to the money, it was, as noted above, never an object of the security sweep, but rather its seizure was sought to be justified under the plain view exception. The fact that the search was probably legal under the law of this Circuit as it stood at the time, see discussion *supra,* is further evidence that the officers acted in an objectively reasonable manner. Their good faith is also demonstrated by their decision to seek the advice of the AUSA on obtaining a warrant, rather than searching on the basis of the oral consents. *See United States v. Fama,* 758 F.2d 834, 837 (2d Cir.1985).

■ Defendant maintains that the agents' inclusion of "tainted" facts in the affidavit is a bar to the good faith exception because it was a reckless or intentional misleading of the magistrate with false information. *Leon* contemplates the case in which facts in the affidavit are later found to be insufficient. That such a determination is made does not preclude a finding of good faith; indeed, it presents the precise situation for application of the good faith exception. There is no evidence that the officers knowingly or recklessly included anything false or omitted anything material in the affidavit, or that they believed any of the submitted material to have been obtained illegally. They properly relied on the Judge's interpretation of the sufficiency of the application and the legality of the search. *See United States v. Buck,* 813 F.2d 588, 593 (2d Cir.1987).

> The DEA agent brought his evidence, including [illegally seized evidence], to a neutral and detached magistrate. That magistrate determined that probable cause to search existed, and issued a search warrant. There is nothing more the officer could have or should have done under these circumstances to be sure his search would be legal. The magistrate, whose duty it is to interpret

the law, determined that [the evidence later found to be improper] could form the basis for probable cause; it was reasonable for the officer to rely on this determination.

*Thomas, supra,* 757 F.2d at 1368. Defendant has not met his burden of showing "by a preponderance of the evidence that the affidavit contained false statements that were material on the issue of probable cause." *United States v. Ferguson,* 758 F.2d 843, 848 (2d Cir.) (citing *Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978)), *cert. denied,* —— U.S. ——, 106 S.Ct. 592, 88 L.Ed.2d 572 (1985).

Finally, defendant implies that Judge Bramwell may have abandoned his judicial role by concluding that there would be no harm in signing the warrant because defendant had consented to the search anyway. Not surprisingly, no portion of the record is cited to support this suggestion. Even if, contrary to my conclusion above, the consent was mentioned as one of the reasons to find probable cause, there is no indication that Judge Bramwell took it as such. Speculation such as this does not approach the showing that would be required for a finding that a judicial officer had not acted in his neutral and detached judicial role. The *Leon* good faith exception applies.

Accordingly, for the reasons stated above, the items seized in the search of the Escobar residence will not, with the exception of the $10,300, be suppressed.

## II. *Sanchez*

### A. *Findings of Fact*

At approximately 6 p.m. on October 28, 1985, officers of NYDETF were stationed outside 43 Valley Road in Old Westbury, Long Island. They believed that house to be the residence of Jose Omar Sanchez, who had been indicted for his alleged role as a primary distributor in the Jose Santa-Cruz Londono cocaine trafficking organization. The agents saw a mover's truck pulling away and they also observed a Mercedes-Benz belonging to Norma Arango,

Sanchez' common law wife, being driven away from the house. The next morning, having learned that Sanchez' and Arango's lease on the premises was to expire on October 31, the agents returned to the house.

Two officers posed as building inspectors in an attempt to see whether Sanchez was inside, but this ruse failed when they were refused admittance. Accordingly, they watched the house from a nearby lot. At about 12:30 p.m., Sanchez and Arango drove away from the house in a Toyota Landcruiser. Agent Jerome McCardle followed in a van. Two other NYDETF vehicles, each with a red police light, then came at the Landcruiser. Backing away from the oncoming vehicles, Sanchez crashed into McCardle's van.

Sanchez was then placed under arrest and advised of his *Miranda* rights. An attache case and a white shopping bag were observed in the Landcruiser, and a wallet was taken from the defendant's person. The wallet contained personal papers as well as other documents that, in the agents' expert opinions, reflected narcotics quantities, cash amounts, and code names of known customers of the Jose Santa-Cruz Londono network.

Sanchez, whose panic had caused him to soil his underwear, asked if he could go home to change and to advise relatives of his arrest. The officers agreed. When they arrived at the house, with Sanchez and Arango in tow, they saw the movers preparing to put furniture into their truck. The entourage entered the residence and encountered Arango's sister, Martha Cetina, Cetina's child, and an elderly woman later identified as Arango's and Cetina's grandmother. A security sweep revealed no other occupants.

Group Supervisor Gerard Murphy spoke to the moving men, who commented on the opulence of the furnishings and disclosed that a cabinet in the house contained a hidden metal safe with a combination dial. After Sanchez changed his clothes and joined the others in the living room, Agent Donald Abrams asked Cetina whether she and her grandmother had any identifica-tion, particularly immigration documents. Cetina said she had some papers but was unsure where they were. Abrams replied that he would accompany her on her search. This did not please Cetina, but the two proceeded to various locations in the house. Abrams did not permit Cetina to search, but rather had her point to what she wanted; as a precaution, he would then examine the place or thing before allowing Cetina to handle the bag or drawer.

Despite the hostility between the participants, the search met with some success: Cetina's Colombian passport was found. Cetina then pointed to a nightstand drawer that she thought might contain her grandmother's documents. When Abrams opened the drawer he saw a large stack of money plainly visible through the open end of a paper bag. He then felt the bag and determined that two stacks of money were inside. After he insured that there was no weapon in the drawer, he allowed Cetina to look for the identification papers.

Abrams then attempted to contact an AUSA, but could not reach any of the prosecutors familiar with the case. In the meantime, McCardle had retrieved the attache case from the Landcruiser. Abrams opened it and discovered jewelry, checks, business cards, and a list of names with corresponding numbers. At approximately 3 p.m., Abrams finally reached AUSA Savitt. They agreed to seek an oral search warrant, with Abrams as affiant. He, along with McCardle and Investigator Raymond Gonzalez, remained at the Sanchez home, while the other officers departed to see to the arrests of the other indicted defendants.

Logistical problems were encountered in arranging for the warrant application. The Magistrate was busy, and recording equipment was unavailable. During the delay of several hours, Abrams had numerous phone conversations with AUSA Savitt. The other agents kept an eye on Sanchez and his family. No search took place during this period.

At about 6:30 p.m. things were finally ready for the government's application. Magistrate Caden issued the warrant. The

officers executing the search discovered address books, business cards, and identification documents, some genuine, some false. Sanchez offered to open the safe; it contained only masking tape. The cash in the nightstand drawer was seized; it totaled $3680.

Martha Cetina testified at the suppression hearing. She stated that Abrams and the other agents were abusive and threatening, and had searched the entire house during the afternoon, prior to the issuance of the warrant. She testified that the money in the nightstand was unwrapped and that she told Abrams that Arango had given it to her to pay the movers. She also stated that Abrams took the money from the drawer and later returned it. I credit little of Cetina's testimony on these points. She was evasive and hostile, and several of her explanations simply did not ring true.

### B. Conclusions of Law

Defendant argues that the warrant issued by Magistrate Caden was not supported by probable cause. Specifically, he alleges that there was insufficient reason to believe that evidence of criminal activity would be found in the place to be searched.

The government's application outlined the conspiracy in which Sanchez allegedly played a major part, and described the organization's practice of using safes in its "stash pads." The Magistrate was also informed that the group maintained detailed ledgers and that Sanchez, who had been arrested pursuant to an indictment and who had tried to flee the approaching officers, was carrying papers with entries similar to those seized from other operatives of the ring. The government also noted several sorts of unexplained wealth: the attache case seized from the defendant's vehicle contained jewelry; there was a good amount of cash in a nightstand; and the rent on the home of the twenty-seven year old defendant was $2500 per month. The application also stated that moving men had described a combination safe hidden in a piece of furniture in the house. Finally, the agent expressed to the Magistrate his expert opinion that evidence of narcotics trafficking would be found in the residence.

Defendant contends that, while there may have been probable cause to believe that he was involved in drug dealing, the application lacked a sufficient nexus to the house that was to be searched. It is certainly true that "it cannot follow in all cases simply from the existence of probable cause to believe a suspect guilty, that there is also probable cause to search his residence." *United States v. Lucarz,* 430 F.2d 1051, 1055 (9th Cir.1970). "The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Zurcher v. Stanford Daily,* 436 U.S. 547, 556, 98 S.Ct. 1970, 1977, 56 L.Ed.2d 525 (1978).

Here, however, the Magistrate had more to go on than simply an alleged narcotics trafficker's residence in the house. The defendant, who was alleged to be a major distributor in a ring using several stash locations, was arrested shortly after leaving the premises and had with him narcotics records and a quantity of seemingly expensive jewelry. Two stacks of cash were discovered in the home, and a hidden safe—a recognized tool of the organization with which Sanchez was allegedly associated—was reportedly located therein as well.

Considering the "totality of the circumstances," *Gates, supra,* 462 U.S. at 238, 103 S.Ct. at 2332, I conclude that Magistrate Caden had a substantial basis to determine that there was a fair probability that a search of the house would reveal the items sought. *See id.* at 238–39, 103 S.Ct. at 2332. While this may not be a particularly strong showing of probable cause to believe that evidence will be found in the particular place to be searched, defendant's description of the application as "bare bones" is hardly a fair characterization. The Magistrate had before him sufficient facts to reach the determination he did. As "a deferential standard of review is appropriate to further the Fourth Amendment's

strong preference for searches conducted pursuant to a warrant," *Massachusetts v. Upton*, 466 U.S. 727, 733, 104 S.Ct. 2085, 2088, 80 L.Ed.2d 721 (1984), the motion to suppress is denied.

Moreover, even if the warrant lacked probable cause, suppression would not be appropriate. There is no reason why the *Leon* good faith exception, see Part I.B. *supra*, should not apply here. Even if the sufficient-nexus-to-the-place-to-be-searched issue were to be decided the other way, it could not be said that the warrant so lacked indicia of probable cause as to render belief in its existence unreasonable. Because " '[t]here are so many variables in the probable-cause equation,' . . . with only a little effort one may locate cases upholding searches in which the supporting affidavit's connection of the person suspected of a crime with the evidence sought and the placed to be searched is skeletal." *United States v. Savoca*, 761 F.2d 292, 297–98 (6th Cir.) (quoting *Gates, supra*, 462 U.S. at 238 n. 11, 103 S.Ct. at 2332 n. 11), *cert. denied*, —— U.S. ——, 106 S.Ct. 153, 88 L.Ed.2d 126 (1985); *see, e.g., United States v. Rambis*, 686 F.2d 620, 623–24 (7th Cir.1982) (defendant seen entering house after purchasing materials to make detonating device; probable cause sufficient); *United States v. Johnson*, 660 F.2d 749, 753 (9th Cir.1981) (affidavit alleged defendant's involvement in major drug deal, stated that another participant lived with her, and proffered expert view that additional evidence would be found at her residence; held sufficient to establish probable cause), *cert. denied*, 455 U.S. 912, 102 S.Ct. 1263, 71 L.Ed.2d 452 (1982).

Nor can it be said that the agents deliberately or recklessly misled the Magistrate. It is suggested that he should have been told that the agents had already searched and that the money found in the nightstand was for paying the movers. I have found as a fact, however, that the officers did not search prior to the issuance of the warrant. Similarly, the only evidence that the agents were told that the stacks of money were for moving expenses came from Cetina, whose testimony I have discounted. Moreover, even if the agents had been so in-

formed, it is unlikely that the Magistrate would have believed this farfetched explanation. Defendant has not met his burden of establishing that the affidavit in support of the warrant contained material falsities. *See Ferguson, supra*, 758 F.2d at 848.

Accordingly, Sanchez' motion to suppress is denied. Probable cause to search existed, and even if it did not, I cannot conclude that a "reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization," *Leon, supra*, 468 U.S. at 922 n. 23, 104 S.Ct. at 3420 n. 23.

### III.  *The Sisters Carvajal*

#### A.  *Findings of Fact*

##### 1.  *Sophie Mejia Carvajal*

At approximately 11:30 p.m. on October 29, 1985, NYDETF officers went to the residence of Sophie Mejia Carvajal at 51-04 Kissena Boulevard in Queens, New York. The officers identified themselves, and defendant, who was there with a male companion, a cousin, and two children, admitted them to the apartment. Defendant was informed that she was under arrest, and was given her *Miranda* rights in Spanish.

Detective Jose Guzman inquired in Spanish whether there were any drugs or contraband in the apartment. Defendant said no. Guzman then handed her a consent to search form (in Spanish). Defendant reviewed the form, which stated that she had the right to refuse consent, to require that a warrant be obtained, to consult an attorney, and to withdraw consent at any time, and that any evidence seized could be used against her. Defendant then stated that the agents could search but that she would not sign anything.

The officers proceeded to search. When a gun was discovered in a dresser drawer, Guzman asked the defendant whether it belonged to her. She replied that it did but that it was unloaded. Other items found included two California driver's licenses— one bearing a false name and the other bearing her maiden name—utility bills in

the name Amparo Herrera, and telephone beepers.

### 2. *Luz Marina Carvajal*

At about 1:30 a.m. on October 30, 1985, NYDETF officers went to the residence of Luz Marina Carvajal at 1903 Clintonville Street in Queens, New York. The defendant admitted them to the house, whereupon she was advised that she was under arrest for federal narcotics violations. It was explained that she had been indicted in this district, and the *Miranda* warnings were administered. Defendant indicated that she understood.

Detective Kenneth Robinson asked whether there were any drugs or weapons on the premises. Defendant replied that there were not and that the officers could look around. This conversation took place in the kitchen. One of the officers looked inside a purse lying on a table in the living room/dining area. Several documents, including a lease for the residence in the names Carlos and Jessica Rios, were found. No other evidentiary material was discovered.

### B. *Conclusions of Law*

Defendants argue, based on Judge Nickerson's holdings in *United States v. Praetorius,* 457 F.Supp. 329 (E.D.N.Y.1978), and *United States v. David,* 565 F.Supp. 901 (E.D.N.Y.), *aff'd without opinion,* 742 F.2d 1441 (2d Cir.1983), that the consents to search were invalid because they were obtained in violation of the sixth amendment right to counsel of the already-indicted defendants.

The *Praetorius* analysis begins by noting that in *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), the Supreme Court held that the sixth amendment barred the use of incriminating statements elicited from a defendant who had been indicted and had retained counsel. The Second Circuit in *Satterfield v. United States,* 558 F.2d 655 (2d Cir. 1976), applied this principle to hold that where such statements are made even after the defendant is aware of the indictment and has been given *Miranda* warnings, the

Constitution is not satisfied absent a knowing and intelligent waiver of sixth amendment rights. The Court stated that "[e]ven if [the defendant's] statements were voluntary for purposes of the fifth amendment, ... they were involuntary with 'regard ... [to] the higher standard with respect to waiver of the right to counsel that applies when the Sixth Amendment has attached.'" *Id.* at 657 (quoting *United States v. Massimo,* 432 F.2d 324, 327 (2d Cir.1970) (Friendly, J., dissenting), *cert. denied,* 400 U.S. 1022, 91 S.Ct. 586, 27 L.Ed.2d 633 (1971)).

Judge Nickerson held that that same higher standard must be met when an indicted defendant consents to a search. *See Praetorius, supra,* 457 F.Supp. at 333–334. Stating that "[t]here is nothing in the Constitution which justifies [a] distinction" between statements and consents, he concluded that if, as the Supreme Court held in *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), "a postindictment line-up is ... a critical stage of the prosecution at which a defendant is entitled to counsel, surely so is a post-indictment request to search the defendant's premises." *Praetorius, supra,* 457 F.Supp. at 334.

The Second Circuit subsequently put teeth into its *Satterfield* holding, stating in *United States v. Mohabir,* 624 F.2d 1140, 1153 (2d Cir.1980), that "a valid waiver of the Sixth Amendment right to have counsel present during post-indictment interrogation must be preceded by a federal judicial officer's explanation of the content and significance of this right." Judge Nickerson drew support from *Mohabir* in reaffirming, in *David, supra,* 565 F.Supp. at 94, that "before an indicted defendant is intentionally placed by the government in a situation likely to induce him to perform acts revealing incriminating evidence [—in that case, describing the contents of a safe and opening it—] he must make a knowing and intentional waiver of his right to counsel."

The government disagrees with the *Praetorius* and *David* decisions and urges this Court to hold that the knowing and intelligent waiver standard should not be

applied to post-indictment consents to search. It argues that while the sixth amendment protects the fairness of the trial, the fourth amendment protects only privacy, an interest unrelated to the integrity of the truth-finding process. Accordingly, in the prosecution's view, the waiver of fourth amendment rights in this case need not be measured against the same strict standard applied to a waiver of sixth amendment rights.

It is true that in *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), the Court explicitly rejected the sixth amendment knowing and intelligent waiver standard in the consent search context. It held that a waiver of fourth amendment rights is valid if under the circumstances the defendant acted voluntarily. The government misperceives, however, the basis of defendants' challenge. The issue is not the validity under the fourth amendment of the waiver of the right to be free from warrantless searches; rather, it is whether the defendants have a right under the sixth amendment to have the advice of counsel in deciding whether to waive their fourth amendment rights.

■ "A person comes under the protection of the sixth ... amendment right to counsel from the moment judicial proceedings are initiated against him, 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment,'" *Carvey v. LeFevre*, 611 F.2d 19, 21 (2d Cir.1979) (quoting *Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972)), *cert. denied*, 446 U.S. 921, 100 S.Ct. 1858, 64 L.Ed.2d 276 (1980). Once the right has attached, it entitles the defendant to representation by counsel at any "critical stage" of the prosecution. *Michigan v. Jackson*, — U.S. ——, 106 S.Ct. 1404, 1409 n. 5, 89 L.Ed.2d 631 (1986) (citing *Wade, supra*, 388 U.S. at 237, 87 S.Ct. at 1937). Defendants here had been indicted prior to their arrests and the subsequent searches, so the question is whether the government's request that the defendant permit a warrantless search of her home is a critical stage of the criminal proceeding.

In making this determination, a court must

> scrutinize *any* pretrial confrontation of the accused to determine whether the presence of his counsel is necessary to preserve the defendant's basic right to a fair trial as affected by his right meaningfully to cross-examine the witnesses against him and to have effective assistance of counsel at the trial itself. It calls upon us to analyze whether potential substantial prejudice to defendant's rights inheres in the particular confrontation and the ability of counsel to help avoid that prejudice.

*Wade, supra*, 388 U.S. at 227, 87 S.Ct. at 1932 (emphasis in original). The *Wade* Court decided that the possibilities for prejudice inherent in lineups, coupled with the defendant's inability to reconstruct any unfairness effectively at trial, rendered that confrontation "critical." *See id.* at 236–237, 87 S.Ct. at 1937.

■ Similarly, police elicitation of uncounseled incriminating statements during the stage between the charge and trial violate the sixth amendment; this is "perhaps the most critical period of the proceedings ... when consultation, thorough-going investigation and preparation [are] vitally important ..." *Massiah, supra*, 377 U.S. at 205, 84 S.Ct. at 1202 (quoting *Powell v. Alabama*, 287 U.S. 45, 57, 53 S.Ct. 55, 59, 77 L.Ed. 158 (1932)). Along the same lines, an accused is entitled to counsel at a stage in the proceedings in which he is required to enter a plea. *See White v. Maryland*, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963); *Hamilton v. Alabama*, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961). By contrast, events that have been viewed as less than critical include the taking of handwriting exemplars, *see Gilbert v. California*, 388 U.S. 263, 267, 87 S.Ct. 1951, 1953, 18 L.Ed.2d 1178 (1967), fingerprint or blood analysis, *see Wade, supra*, 388 U.S. at 227–28, 87 S.Ct. at 1932–33, and photo identification without the defendant's presence, *see United States v. Ash*, 413 U.S. 300, 321, 93 S.Ct. 2568, 2579, 37 L.Ed.2d 619 (1973).

Obtaining a post-indictment consent to search is much more similar to the former line of cases. The precedents in the latter set involve technical or mechanical exercises, where the presence of an attorney is unlikely to enhance appreciably the fairness of the proceeding. *See Wade, supra,* 388 U.S. at 227–28, 87 S.Ct. at 1932–33 (where knowledge of technology is available and variables few enough, cross-examination of government's experts provides sufficiently meaningful confrontation). The first group of cases, however, involves situations where counsel's presence may have a significant effect, either by assuring propriety of a potentially prejudicial event, as in *Wade,* or by providing informed advice to an accused who must make an important judgment, such as whether to plead, as in *Hamilton* and *White,* whether to make a statement, as in *Massiah,* or whether to permit a search, as in this case.

There are several ways in which the presence of an attorney can help a defendant in the consent search context. For example, a lawyer can ensure that the circumstances under which the consent is obtained are not coercive. He can analyze whether probable cause exists such that a warrant would issue in any event. He can assess the potential evidentiary value of any items that might be seized. The argument that the defendant has a right to have counsel advising him and acting as his assistant, *see Ash, supra,* 413 U.S. at 312, 93 S.Ct. at 2575, is even stronger in the context of a request for consent to search than it was in *Wade,* where the encounter did not call for any judgment or decision on the part of the defendant.

■ Accordingly, I join Judge Nickerson in holding that the sixth amendment bars the admission of the fruits of a search where consent was obtained from an indicted defendant in the absence of counsel. *See David, supra,* 565 F.Supp. 901; *Praetorius, supra,* 427 F.Supp. 329; *see also Cody v. Solem,* 755 F.2d 1323, 1330 (8th Cir.) (court, in holding that defendant's sixth amendment rights not infringed because he had the opportunity to consult with lawyer prior to giving consent to search, assumes that there would be a violation absent such opportunity), *cert. denied,* —— U.S. ——, 106 S.Ct. 104, 88 L.Ed.2d 84 (1985).

This result comports with the principle that "the Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a 'medium' between him and the State." *Marine v. Moulton,* 477 U.S. 159, 106 S.Ct. 477, 487, 88 L.Ed.2d 481 (1985).

Indeed, after a formal accusation has been made—and a person who had previously been just a "suspect" has become an "accused" within the meaning of the Sixth Amendment—the constitutional right to the assistance of counsel is of such importance that the police may no longer employ techniques for eliciting information from an uncounseled defendant that might have been entirely proper at an earlier stage of their investigation.

*Jackson, supra,* 106 S.Ct. at 1409.

■ Having determined that the sixth amendment was implicated I must next determine whether there was a knowing and intelligent waiver of rights under that provision. *See Brewer v. Williams,* 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977); *Carvey, supra,* 611 F.2d at 21. I hold that the "failure to inform [Sophie Mejia Carvajal] of the pending indictment preclude[s] knowing waiver of [her] sixth amendment rights." *Carvey, supra,* 611 F.2d at 22.

Without knowledge of a pending indictment, the accused cannot appreciate the gravity of his legal position or the urgency of his need for a lawyer's assistance.... [If] he know[s] that he [is] not merely suspected of the crime but actually under indictment, [he] might well [be] more circumspect in his replies and more insistent on his immediate right to counsel.

*Id.* Similarly, although Luz Marina Carvajal was told that she was being arrested on the basis of an indictment, she cannot be regarded as having knowingly and intelligently waived her sixth amendment rights.

While informing a defendant that he has been indicted is highly important, *see*

*Carvey, supra,* 611 F.2d at 22, it is not in and of itself necessarily sufficient to safeguard the defendant's Sixth Amendment rights; mere knowledge of a pending indictment, without understanding of its meaning, may not allow the accused to 'appreciate the gravity of his legal position or the urgency of his need for a lawyer's assistance.' *Id.* at 22.

*Mohabir, supra,* 624 F.2d at 1149. Luz was not shown a copy of the indictment, *see id.,* nor was she informed of its significance. Even if something less than *Mohabir*'s explanation by a judicial officer would suffice, the agents here did not provide it.

Nor is the constitutional analysis altered by the fact that Luz volunteered the consent, in contrast to Sophie, who responded to a direct request by the officers. Luz' comment was "deliberately elicited" within the meaning of the sixth amendment, *see United States v. Henry,* 447 U.S. 264, 272, 100 S.Ct. 2183, 2188, 65 L.Ed.2d 115 (1980), because it came in response to an inquiry whether drugs or weapons were in the house. Elicitation exists where the government "intentionally creat[es] a situation likely to induce [a defendant] to make incriminating statements without the assistance of counsel." *Id.* It is not surprising that a person asked whether illegal items are in her residence will invite the agents to see for themselves, *cf. David, supra,* 565 F.Supp. at 904–05, especially where, as here, there is no contraband on the premises.

This is not to suggest any improper motive on the part of the officers. I do not believe that they acted in bad faith. They simply overlooked the risk that if they treated these defendants the way they would treat unindicted arrestees, sixth amendment violations might occur.

■ Accordingly, for the reasons stated above, the fruits of the two consent searches are hereby suppressed. The government suggests that the items seized from Luz' pocketbook may be admitted as the fruits of a search incident to arrest. Under *Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969), an arresting officer may search the suspect's person and "the area into which [he] might reach in order to grab a weapon or evidentiary items." The difficulty with the government's argument is that the record reveals that the pocketbook was on a table in the living/dining area, and cannot be said to be within the "grab area" of the defendant, who was in the kitchen. Thus, because seizure cannot be justified as incident to arrest, the evidence from the pocketbook is inadmissible.

### *Conclusion*

Defendant Escobar's motion to suppress is granted only with respect to the $10,300 seized from above the attic door. Defendant Sanchez' motion to suppress is denied in its entirety. The motions to suppress the fruits of the searches of the residences of defendants Luz and Sophie Carvajal are granted.

Prior to the hearings in this case several defendants submitted standard motion papers including boilerplate requests for discovery, particulars and the like. The Court assumes that defendants seek decisions only on those matters raised in their post-hearing submissions, and only those issues have been addressed in this Opinion. If there are any further problems to be considered in advance of trial, the parties are directed to bring them to the Court's attention by letter.

SO ORDERED.