UNITED STATES of America,

v.

Natasha GONZALEZ, Defendant.

No. CR–03–297(NGG).

United States District Court, E.D. New York.

July 29, 2004.

Marshall L. Miller, United States Attorney's Office, Samantha Schreiber and Michael Beys, Assistant U.S. Attorneys, Brooklyn, NY, for United States.

Daniel Myers, Esq., Steven M. Bernstein, New York, NY, for Defendant Gonzalez.

### Order

GARAUFIS, District Judge.

On May 4, 2004, this court referred Natasha Gonzalez' motion to suppress to Magistrate Judge Steven M. Gold for a report and recommendation. *See* 28 U.S.C. § 636(b)(1). On June 16, 2004, Magistrate Judge Gold issued a Report and Recommendation ("R & R") which recommended that Natasha Gonzalez' motion to suppress be granted. No objections to the R & R have been filed. After carefully reviewing the R & R, pursuant to 28 U.S.C. § 636(b)(1), the court hereby ADOPTS Magistrate Judge Gold's R & R in its entirety. Natasha Gonzalez' motion to suppress is GRANTED.

SO ORDERED.

### *REPORT AND RECOMMENDATION*

GOLD, United States Magistrate Judge.

#### *Introduction*

Defendant Natasha Gonzalez is charged in this case in a superseding indictment returned on May 23, 2003. The superseding indictment charges Gonzalez and sixteen others with conspiring to distribute crack cocaine and heroin and with using a firearm in furtherance of the conspiracy. Arrest warrants were issued for Gonzalez and her co-defendants upon the return of the superseding indictment, and Gonzalez and several others were arrested pursuant to those warrants on May 28, 2003.

Gonzalez has moved to suppress five photographs seized from her bedroom at the time of her arrest. United States District Judge Garaufis has referred defendant's motion to me for report and recommendation. Docket Entry 139. I conducted a hearing on the motion on April 30, 2004, and received post-hearing letters from the government dated May 19, 2004, and from defendant Gonzalez dated June 2, 2004. Having considered the testimony presented at the hearing and the post-hearing letters submitted by the parties, I respectfully recommend that defendant's motion to suppress be granted.

#### *Facts*

The facts recounted in this report and recommendation are drawn from the testimony of New York City Police Detectives John Beale and Joseph Fazzingo, the two

witnesses called by the government at the suppression hearing. I found the testimony of the detectives to be entirely credible. Defendant did not testify or call any witnesses at the hearing.

Detective Beale was one of several law enforcement officers assigned to participate in the coordinated arrests of the various defendants charged in this case. Tr. 8–10.[1] Detective Beale's particular assignment was to participate in executing the warrant for the arrest of defendant Gonzalez. Tr. 8. Detective Fazzingo was one of two case officers in charge of the investigation of Gonzalez and her co-defendants; Beale, on the other hand, had not previously participated in the investigation and was apparently not familiar with the evidence leading to the superseding indictment. Tr. 45.

Before heading out to execute the various arrest warrants, Beale and his fellow officers were briefed and provided with a written tactical plan by officers, including Detective Fazzingo, who had conducted the investigation of Gonzalez and her co-defendants. Tr. 49. The documents pertaining to Gonzalez indicated that she lived in one of seven apartments on the first floor of an apartment building. Gov't Ex.1. Gonzalez' building was one of several spread over two square blocks which together comprised a single complex known as the Gowanus Houses. *Id.*

In addition to geographical information, the documents provided to Beale indicated that the investigation leading to Gonzalez' arrest involved a "violent narcotics organization" whose members were known to have shot at rival drug gangs and police officers. *Id.* The documents instructed arresting officers that "cell phones, pagers, photographs relative to this investigation and personal papers should be confiscated and vouchered as investigatory evidence." *Id.*

At approximately 6:00 a.m. on the morning of May 28, 2003, Beale and his fellow officers knocked on Gonzalez' apartment door. Tr. 9, 16–20. An elderly woman opened the door, and Beale observed Gonzalez inside the apartment. Tr. 17. After directing Gonzalez into the living room of her apartment, Beale conducted a protective sweep, checking the bathroom and bedrooms to be certain no one else was present. Tr. 20.

Upon entering Gonzalez' bedroom, Beale noticed several photographs wedged into the wooden frame surrounding a mirror. Tr. 21–22. The photographs struck Beale because it appeared to him that one of the individuals pictured was wearing correctional facility clothing and that others were using "gang signs." Tr. 22. Beale acknowledged, however, that he did not recognize any of the individuals pictured in the photographs. Tr. 22, 34, 38–39. Beale removed five photographs which he believed to be pertinent from the mirror, leaving behind those pictures—such as photographs of children—which had not aroused his suspicions. Tr. 23, 37.

Detective Fazzingo was at that time stationed outside the building where Gonzalez lived. Tr. 23. Fazzingo had arrived at the housing project earlier, and had arrested one of the other defendants named in the superseding indictment. Tr. 51. Fazzingo's other responsibilities that morning included identifying the individuals named in the arrest warrants being executed, vouchering property, and coordinating the overall operation. Tr. 51.

Approximately ten minutes after he took the photographs from the mirror frame, Beale and the other arresting officers removed Gonzalez from her apartment.

---

1. "Tr." refers to the transcript of the suppression hearing held on April 30, 2004.

Beale brought the pictures he had taken from the mirror with him as well. Tr. 23. Fazzingo had by then approached the door leading to the building where Gonzalez was arrested in response to a request he received over the radio from Beale or one of the other officers on the scene. Tr. 53, 74. Fazzingo confirmed the identity of Gonzalez, went to two other nearby addresses to confirm the identity of two other individuals who had been arrested, and then returned to the entrance to Gonzalez' building. Tr. 55. At that point, Beale approached Fazzingo and showed him the photographs. Tr.24–25. Fazzingo, who as noted above was one of two case officers leading the investigation, was able to recognize each of the defendants named in the superseding indictment. Tr. 47. Upon seeing the photographs, Zaffingo recognized three of them as pictures of other defendants named in the superseding indictment, and believed—erroneously, as closer examination later revealed—that the two others depicted co-defendants as well. Tr. 57–61, 64. Zaffingo then arranged to have the photographs vouchered as evidence in this case. Tr. 57.

### Procedural Background

On April 2, 2004, United States District Judge Garaufis issued a Memorandum and Order ("M & O") addressing several pretrial motions. Judge Garaufis noted that Detective Beale and his fellow officers were executing an arrest warrant for defendant Gonzalez at the time the photographs were seized, and were thus lawfully inside of her apartment. M & O 6. Judge Garaufis accordingly held that the officers were permitted to conduct a protective sweep of Gonzalez' apartment incident to her arrest. M & O 6. Finally, Judge Garaufis pointed out that defendant's affidavit submitted in support of her motion to suppress did not challenge the government's assertion that the photographs were in plain view at the time Beale took them. M & O 6–7. Judge Garaufis therefore granted defendant a hearing limited to the issue of whether the officers who seized the photographs had probable cause to believe they constituted evidence of criminal activity. M & O 9.

In his Order referring defendant's motion for report and recommendation, Judge Garaufis recognized that the evidence presented at the hearing held before me might be relevant to the preliminary questions he had addressed in his Memorandum and Order. Judge Garaufis therefore withdrew the portion of his M & O addressing whether Detective Beale was lawfully present when he viewed the photographs in issue and referred defendant's motion to suppress the photographs to me in its entirety.

### Discussion

A. The Fourth Amendment and the "Plain View" Exception to the Warrant Requirement

■ A search or seizure conducted without a warrant based upon probable cause is *per se* unreasonable under the Fourth Amendment. *See e.g., Minnesota v. Dickerson*, 508 U.S. 366, 372, 113 S.Ct. 2130, 2135, 124 L.Ed.2d 334 (1993); *Horton v. California*, 496 U.S. 128, 134 n. 4, 110 S.Ct. 2301, 2306 n. 4, 110 L.Ed.2d 112 (1990); *United States v. Kiyuyung*, 171 F.3d 78, 83 (2d Cir.1999). This *per se* rule is "subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). The plain view doctrine establishes one of these few exceptions. Under this doctrine, "if police are lawfully in a position from which they can view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may

seize it without a warrant." *Dickerson,* 508 U.S. at 375, 113 S.Ct. at 2136–37.

Defendant does not argue that the evidence presented at the hearing provides any basis for revisiting the questions preliminarily decided by Judge Garaufis, nor could she. The unchallenged evidence confirms that Detective Beale was lawfully present in defendant's apartment to execute a validly issued arrest warrant, and that Beale observed the photographs in issue out in the open and in plain view while conducting a protective sweep incident to defendant's arrest. *See Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). Beale was thus "lawfully in a position" from which he could view the photographs and had a "lawful right of access" to them. I therefore turn my attention to the narrow question originally posed by Judge Garaufis: did the arresting officers have probable cause to believe the photographs they seized were evidence of criminal activity; that is, as the issue is framed in the cases cited above, was the "incriminating character" of the photographs "immediately apparent"?

The government does not contend that Beale himself, who did not recognize anyone in the photographs, had probable cause to seize them when he removed them from the mirror. Similarly, defendant does not argue that Fazzingo's belief that he recognized the individuals depicted in the photographs to be among defendant's co-conspirators was insufficient to establish probable cause. Rather, the issue presented by defendant's motion is whether suppression is warranted because probable cause was established only after Beale removed the photographs from Gonzalez' apartment and showed them to Fazzingo.

The government presents two alternative arguments to support its position that the photographs were lawfully seized. First, the government argues that the "collective knowledge" of the seizing officers— i.e., Fazzingo's knowledge as well as Beale's—should be considered when deciding whether Beale's removal of the photographs from the mirror—and later the apartment—was supported by probable cause. Second, the government asserts that Beale had reasonable suspicion to believe the photographs constituted evidence of criminality, and that Beale's reasonable suspicion was sufficient to support the brief investigatory detention of the photographs necessary to bring them outdoors to Fazzingo for inspection. Each of these arguments is addressed below.

## B. The "Collective Knowledge" Doctrine

The collective knowledge doctrine allows a court, under certain circumstances, to consider the information known to all of the law enforcement officers involved in a criminal investigation when determining whether the officers had probable cause to arrest a suspect or search for and seize evidence. *See, e.g., United States v. Shareef,* 100 F.3d 1491, 1503–04 (10th Cir.1996). The doctrine is frequently applied when officers in the field make an arrest or conduct a search based upon orders previously issued by a supervising officer who possesses information sufficient to justify the search or seizure under the Fourth Amendment. *Shareef,* 100 F.3d at 1503 n. 4. *See also United States v. Hensley,* 469 U.S. 221, 231, 105 S.Ct. 675, 681, 83 L.Ed.2d 604 (1985) (holding that, "when evidence is uncovered during a search incident to an arrest in reliance merely on a flyer or bulletin [issued by another law enforcement agency], its admissibility turns on whether the officers who *issued* the flier possessed probable cause to make the arrest. It does not turn on whether those relying on the flyer were themselves aware of the specific facts

which led their colleagues to seek their assistance.") (emphasis in original); *United States v. Canieso*, 470 F.2d 1224, 1230 n. 7 (2d Cir.1972).

The collective knowledge doctrine has been applied in a case where one officer removed documents without probable cause for the purpose of showing them to another officer more familiar with the investigation. In *United States v. Menon*, 24 F.3d 550 (3d Cir.1994), a precedent upon which the government heavily relies, agents obtained a warrant to search the defendant's business premises for documents concerning Abad Fisheries. The team of agents assigned to conduct the search were instructed by their supervisor to look as well for any documents in plain view pertaining to a second company named Jabeco. While the supervisor searched the defendant's office, a second agent in an adjoining room searched a desk used by the defendant's secretary. The second agent came upon documents bearing the name Jabeco, removed them from the secretary's desk, and brought them into defendant's office to show to her supervisor. Although the knowledge possessed by the agent searching the secretary's desk did not give rise to probable cause, the supervising agent, upon viewing the Jabeco documents, was able to determine that there was probable cause to believe they constituted evidence of criminality. 24 F.3d at 559.

■ The defendant in *Menon* challenged the seizure of the Jabeco documents on the grounds that it was not immediately apparent to the second agent that the documents constituted evidence of criminality, and that the agent therefore had no lawful right to remove the docu-

ments from the secretary's desk and bring them into the next room. The court first held that the movement of the documents from the secretary's desk into the adjoining office was too minimal an interference with possessory rights to constitute a seizure, and that probable cause was therefore not required. 24 F.3d at 560. The court was less certain that the more knowledgeable agent's review of the documents did not constitute a separate, new search, however, because his inspection "was likely to reveal private information that had not been revealed" to the junior officer. 24 F.3d at 562.[2] Nevertheless, the court rejected the defendant's argument, holding that "the immediate apparency of criminality should be measured, at a minimum, by the collective knowledge of the officers on the scene." 24 F.3d at 562.

■ The government argues that Detective Beale's conduct in this case was analogous to the removal of documents from the secretary's desk in *Menon*. In *Menon*, however, the officer whose additional knowledge was necessary to support seizure *was within the premises being searched;* no property was removed from the premises until probable cause for its seizure was developed. In contrast, Beale removed Gonzalez' photographs from her apartment and brought them outdoors before he had probable cause to seize them. Gonzalez' possessory rights were thus infringed to a far greater extent than the rights of the defendant in *Menon*.

The remaining cases cited by the government are similarly distinguishable. In *United States v. Johnston*, 784 F.2d 416 (1st Cir.1986), agents executing a search warrant for narcotics came upon adding machine tapes, a notebook and loose

---

**2.** The Fourth Amendment's prohibition against unreasonable searches protects privacy interests; the Amendment's prohibition against unreasonable seizures protects posses-

sory interests. Both are of equal constitutional importance. *See, e.g., Horton v. California,* 496 U.S. 128, 143, 110 S.Ct. 2301, 2311, 110 L.Ed.2d 112 (1990) (Brennan, J., dissenting).

sheets of paper in plain view. The items were first observed by junior officers, who showed them to a more senior detective named Hyde who was also participating in the search. At that point, Hyde did not seize the items, but continued the search, and developed additional information as he did so. The court held that it was proper to consider whether there was probable cause to seize the items based upon Hyde's knowledge and experience, rather than merely upon the knowledge possessed by the first officer to come upon them. In addition, the court held that Hyde needed to have probable cause only at the time he seized the items, and not when he first observed them in plain view. 784 F.2d at 820.

The reasoning employed by the court in reaching its holding is particularly pertinent here. The court held that "[t]he executing officers are not limited by the fortuity of which officer first happened upon the evidence. They may be limited by the shared knowledge and experience *of the officers otherwise lawfully on the premises,* but in this case ... Hyde [was among the] executing officers." 784 F.2d at 820 (emphasis added). Similarly, although the court rejected defendant's argument that Hyde needed to have probable cause when he first observed the items he seized, it noted that "[a] plausible limitation would require Hyde to form probable cause *during this search in this house,* but the more specific limitation urged by [defendant] does not seem prudent." *Id.* (emphasis added).

Similarly, in *United States v. Wells,* 98 F.3d 808 (4th Cir.1996), one of several agents executing a search warrant for the defendant's apartment found a loaded firearm in plain view. The warrant did not authorize a search for weapons, and the agent who came upon the gun did not have a basis to believe its possession to be criminal. The agent nevertheless reported his discovery to a fellow agent in the apartment who was supervising the search. The supervising agent was aware that the defendant had a felony record, and that his possession of the firearm was therefore unlawful. Accordingly, the supervisor instructed the agent who had discovered the weapon to seize it. The court upheld the seizure of the weapon, reasoning that "although the agent who actually seized the weapon pursuant to the supervising agent's instructions had no personal knowledge that Wells was a convicted felon, it is sufficient that the agents collectively had probable cause to believe the weapon was evidence of a crime at the time of its seizure." 98 F.3d at 810. Thus, in *Wells* as in *Menon,* the agent whose information supported the seizure was a member of the search team and was inside of the premises being searched at the time of the seizure. *See also United States v. Robinson,* 756 F.2d 56 (8th Cir. 1985) (holding that, when agents executing a search warrant for narcotics came upon a firearm in plain view, they properly detained the firearm for security reasons, and that when the same agents at a later point in their search came upon documents indicating the resident had a felony record, the firearm could lawfully be seized); *United States v. Blakeney,* 753 F.2d 152 (D.C.Cir.1985) (holding that subsequent discovery during same search of papers indicating defendant was on parole permitted agents to return to and seize a firearm they had previously observed in plain view).

The government has cited no cases holding that information known to law enforcement officers who are outside a premises may be imputed, absent prior communication or instructions, to agents conducting a search or effecting an arrest within the premises. To the contrary, at least one court has explicitly rejected the notion that

officers executing a search warrant could request that a firearms expert join them at the premises being searched to examine weapons found in plain view; the court held that the weapon's incriminating character could not be said to be "immediately apparent" if it could be discerned only by a law enforcement officer called to the scene by members of a search team whose own expertise was insufficient to support a finding of probable cause. *United States v. Szymkowiak,* 727 F.2d 95 (6th Cir.1984).

It might at first seem overly formalistic to distinguish between removing documents from a desk to bring them into an adjoining room and removing pictures from a mirror to take them outdoors. However, Fourth Amendment jurisprudence draws clear lines; as noted above, the Fourth Amendment's warrant requirement is subject "only to a few specifically established and well-delineated exceptions." *Katz,* 389 U.S. at 357, 88 S.Ct. at 514. Moreover, the Fourth Amendment is especially concerned with the sanctity of an individual's home:

> The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms: "the right of the people to be secure in their ... houses ... shall not be violated." That language unequivocally establishes the proposition that "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States,* 365 U.S. 505, 511, 81 S.Ct. 679, 683, 5 L.Ed.2d 734.... [T]he Fourth Amendment has drawn a firm line at the entrance to the house.

*Payton v. New York,* 445 U.S. 573, 589–90, 100 S.Ct. 1371, 1381–82, 63 L.Ed.2d 639 (1980). *See also Wilson v. Layne,* 526 U.S. 603, 609–10, 119 S.Ct. 1692, 1697, 143 L.Ed.2d 818 (1999). Accordingly, it is reasonable to draw a line at the threshold to Gonzalez' apartment, and to hold that the Fourth Amendment requires that law enforcement officers could have properly removed Gonzalez' property from her apartment only if they had first developed probable cause to do so.

### C. Reasonable Suspicion

■ The government presents an alternative argument in support of admissibility of the seized photographs. Although it concedes that Beale lacked probable cause to seize the photographs at the time he took them out of Gonzalez' apartment, the government contends that Beale did have a reasonable suspicion that the photographs constituted evidence of criminality. The government asserts that the Supreme Court's holding in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), therefore justifies the brief interference with Gonzalez' possessory rights which occurred from the time Beale removed the photographs from the apartment until the pictures were viewed by Detective Fazzingo in the courtyard.

The government correctly points out that *Terry's* approval of temporary investigative detentions based upon reasonable suspicion has been applied to personal possessions. *See United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (stating that *Terry* would authorize police at an airport with reasonable suspicion that a traveler's luggage contained narcotics to detain the luggage briefly and expose it to a narcotics detection dog); *United States v. $557,933.89,* 287 F.3d 66, 85–86 (2d Cir.2002) (relying on *Place* and holding that a brief detention of a brief-

case by airport security personnel was authorized by *Terry* ).

The problem with the government's argument is that it flies in the face of the Supreme Court's holding in *Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987). In *Hicks*, police responding to a shooting entered an apartment to search for the shooter, any victims and weapons. Defendant conceded at trial that the officers' initial entry and search were justified by exigent circumstances. While inside the apartment, the officers observed in plain view expensive stereo components which seemed out of place. Suspecting that the equipment might be stolen, the officers moved the components enough to observe their serial numbers. After calling their headquarters with the serial numbers, the officers learned that the equipment had in fact been taken in an armed robbery, and they seized it.

The Supreme Court held that moving the stereo components to reveal their serial numbers constituted a search because it was an "action, unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the apartment or its contents." 480 U.S. at 325, 107 S.Ct. at 1152. The prosecution conceded that the officers lacked probable cause to believe the components were stolen until after they moved them and investigated their serial numbers. However, the prosecution argued that, because the search was so minimally intrusive, it could be supported by reasonable suspicion. The Supreme Court explicitly rejected the prosecution's argument and held that, to support a plain view search or seizure, "probable cause is required." 480 U.S. at 326, 107 S.Ct. at 1153.

The *Hicks* Court acknowledged that, in certain other circumstances, a seizure may be justified on less than probable cause, "where, for example, the seizure is mini-

mally intrusive and operational necessities render it the only practicable means of detecting certain types of crime." 480 U.S. at 327, 107 S.Ct. at 1154. Thus, seizures based upon reasonable suspicion have been upheld in cases involving searches of vehicles believed to be transporting illegal aliens and, as in *Place*, where luggage suspected of containing contraband was seized at an airport. In the instant case, the government has not pointed to any "operational necessities" or shown that seizures based on anything less than probable cause are generally necessary to investigate narcotics distribution conspiracies of the sort charged in this case. Rather, as in *Hicks*, the government relies on "the mere fact that the items in question came lawfully within the officer's plain view," and, as *Hicks* makes clear, "[t]hat alone cannot supplant the requirement of probable cause." 480 U.S. at 327, 107 S.Ct. at 1154.

*Hicks* was applied by this Court in *United States v. Londono*, 659 F.Supp. 758 (E.D.N.Y.1987). In *Londono*, an officer conducting a security sweep noticed a block-shaped object in plain view wedged into the top of a door. Suspecting the object might be a weapon, the officers "flicked" it, and it fell to the floor. 659 F.Supp. at 760. When the object reached the floor, the officer was able to see that it was in fact a package of currency. The court noted that, before *Hicks* was decided, officers were generally permitted to touch or move an item found in plain view as part of a cursory investigation to determine if probable cause for seizure existed. 659 F.Supp. at 762. However, the court went on to hold that, after *Hicks*, touching or moving an item without probable cause was impermissible. The court therefore concluded that the incriminating character of the currency was not "immediately apparent" and it could not be admitted pur-

suant to the plain view doctrine because probable cause was lacking until after it was "flicked" and fell to the floor. 659 F.Supp. at 762. *See also United States v. DiNapoli,* No. 01–Cr–51, 2002 WL 334519 (S.D.N.Y. Feb.28, 2002).

The facts of this case are controlled by the Supreme Court's decision in *Hicks.* Although *Hicks* involved a search implicating privacy rights and this case involves a seizure implicating possessory rights, both, as noted above, are of equal Fourth Amendment concern. *Horton v. California,* 496 U.S. 128, 143, 110 S.Ct. 2301, 2311, 110 L.Ed.2d 112 (1990) (Brennan, J., dissenting). If reasonable suspicion is insufficient to support the minimal invasion of privacy involved in moving stereo components to reveal their serial numbers, it is certainly insufficient to justify the interference with possessory rights which occurs when private property is removed from its owner's home.

### Conclusion

For all these reasons, I respectfully recommend that defendant Gonzalez' motion to suppress be granted. Any objections to the recommendations contained in this report must be served and filed with the Clerk of the Court and the chambers of the Honorable Nicholas G. Garaufis within ten days of receipt, and in any event no later than July 9, 2004. Failure to file timely objections to this report may waive the right to appeal the district court's order. *See* 28 U.S.C. § 636(b)(1); *Small v. Secretary of Health and Human Services,* 892 F.2d 15, 16 (2d Cir.1989).

June 18, 2004.